UNITED STATES of America, on the relation of and for the use of Eric SOBY, d/b/a Soby Painting Co., Plaintiff,

v.

Lloyd W. JOHNSON and Max J. Kuney, individually and as co-partners, d/b/a Kuney Johnson Company, United Pacific Insurance Company of Tacoma, General Casualty Company, Los Angeles, American Reinsurance Corporation of New York, and Trinity Universal Insurance of Dallas, Texas, Defendants,

and

United States Fidelity and Guaranty Company, a Corporation, Additional Defendant.

Civ. No. A–10628.

District Court, Alaska
Third Division, Anchorage.
Jan. 9, 1957.

E. L. Arnell, Anchorage, Alaska, for plaintiff and for additional defendant.

Lee Olwell, Paul R. Cressman, Seattle, Wash., Paul F. Robison, Anchorage, Alaska, for defendants.

H. C. Wilson, Seattle, Wash., for additional defendant.

McCARREY, District Judge.

In substance, this is an action by an individual painting subcontractor against the prime contractor under 40 U.S.C.A. § 270a et seq., more popularly referred to as the "Miller Act".

The case was tried before the court and with the pre-trial conference consumed 18 days, during which time some 90 exhibits were admitted, with myriads of some 110 sub-divisional exhibits, such as change orders, modifications, invoices, correspondence, etc., while 26 witnesses were called, a number of them being called several times.

The plaintiff entered into two sub-painting contracts with the defendant Kuney Johnson Company, a partnership prime contractor. One was known as the Ladd contract and the other as the Eielson contract.

The scope of the work to be performed under the Ladd contract, known as DA–95–507–eng–384, by the plaintiff, was for the "painting of 14 eight-family quarters including the washing of the windows but not including the painting of the kitchen cabinets or the finishing of the wood floors, $78,293.00, taping all of the plaster board for such job, $30,820.00", for a total of $109,113. The scope of the work to be performed under the Eielson contract, known as DA–95–507–eng–385, was for the furnishing of all the labor, material, equipment and services required to perform all the painting and taping of five 3-story airmen dormitory buildings and one 1-story mess and administration combination building, being constructed by the prime contractor, in the lump sum of $95,070, subject to certain specific deductions (which are not material to the determination of this case) if they were approved by the contracting officer.

These contracts are more in the form of purchase orders than standard form contracts, and are classic examples of false concepts of economy as to legal assistance.

In plaintiff's first cause of action he sued the defendants for $102,160.80 for damages he allegedly sustained in performance of his contracts with the defendants, due to their use of improperly sized and applied sheetrock and because the defendants used lumber containing moisture content in excess of that allowable in the specifications, resulting in shrinkage, warping and structural movement of the buildings, thus causing him to do additional work and in several instances, to completely do his work over a number of times, which deprived him of the profit he normally would have made had the defendants com-

plied with the specifications of the contract.

On the second cause of action, the plaintiff sued the defendants for $31,501.59 by way of special damages he allegedly sustained in the payment of taxes, penalty, interest, travel expenses and loss on taping contract, and for extra equipment rental which he had to pay upon his contract for the same reasons.

The defendant Kuney Johnson Company counterclaims for $81,009.85 on the Ladd contract, for damages it allegedly sustained because of plaintiff's willful failure to complete his contract, and, in a second cause of action, for the sum of $53,955.43 on the Eielson contract for the same reasons as on the Ladd, and for the additional sum of $4,839.39 which the defendant contractor either had paid or was legally required to pay in order to protect its credit for supplies, labor and materials of claims filed with the defendant which were purportedly obligations of the plaintiff. This claim was subsequently dismissed upon oral motion made by the defendants.

The additional defendant, United States Fidelity and Guaranty Company is plaintiff's bondsman.

The plaintiff Eric Soby was born in Denmark and completed four years of apprenticeship before emigrating to Canada in 1928. He later moved to the United States where he was engaged in painting most of the time, coming to Alaska in 1950, where he continued to be employed in the painting business. These two contracts were his first jobs of such proportions.

Work was commenced by the plaintiff on or about the 11th day of June 1953, and because of his inability to obtain the number and quality of tapers in Alaska at that time, he flew to Seattle and entered into another subcontract with one Minor Bottorff, who was to do all of his taping for 3½¢ per foot.

Portions of the taping were performed by a taping machine which was relatively new in use in Alaska, but which had been in use in the states for several years.

Since the plaintiff had other painting contracts at the time, he placed one Garfield Carlson in direct charge of the work as general superintendent, under his supervision, who remained in this capacity until he was fired by defendants on the 23rd day of October 1953, at which time one Harry Garvik, son-in-law of the plaintiff, took over, with one Ballard Dean, who was foreman under Carlson, being directly in charge of painting from that date forward.

While plaintiff made frequent trips to Fairbanks to oversee the work, the work was always under the immediate supervision of another person.

Plaintiff had between six and eight men on the job most of the time, however, at one time he had a peak employment of 34 employees.

Harry Garvik had been sent by the plaintiff to Fairbanks on June 12, 1953, and had worked in the office, handling the payroll, correspondence, and signing most of the checks until October 23, 1953, when Carlson was fired.

Some of the items were painted in Seattle (i. e. the doors) prior to their shipment to the job site.

The plaintiff had labor problems arise at these jobs on at least three occasions.

The defendant Kuney Johnson Company had been engaged in the construction business for a number of years and had commenced its first construction work in Alaska in 1948. The company, in fact, had built one eight-family unit similar to the one specified in contract 384, the previous year (1952) for the Alaska Communications System at Ladd Field, Fairbanks, Alaska.

The plaintiff ordered the lumber to be used on the project in December 1952 from Newport, Oregon, and had it shipped to Alaska, where most of it arrived the latter part of March or the first part of April 1953 (plaintiff's exhibit 6). The plaster board, generally referred to in the building trade as sheetrock, was shipped from the states via boat to Seward,

thence by rail to Fairbanks, as was also the lumber. There were some 430,976 square feet of plaster board originally ordered, of which 208,104 square feet were damaged enroute, due to extremely heavy seas and winds which were encountered by the vessel enroute to Alaska. As a result, the cargo shoring was broken which allowed the cargo to shift (plaintiff's exhibits 10 and 11).

The plaintiff took the position throughout the trial that the moisture content in the lumber used by the general contractor was excessive and above the minimum set forth in the specifications, and that after it had been installed in place it shrank, which shrinking pulled the sheetrock and taping, necessitating his repainting and retaping his work excessively. His witnesses further testified that the damaged sheetrock was not properly culled and, further, that it was not properly applied, which caused a most unusual amount of "popping of nails", a term commonly applied in the application of sheetrock when it pulls away from the studs. Plaintiff also contended that because of the improper application of the sheetrock and the use of lumber which contained an excessive moisture content supra, it was necessary for him to do his work over as many as seven times in one building for which the prime contractor agreed to pay him extra.

It is interesting to note, however, that the only time he made application for extras was in a letter dated the 28th day of October 1953, which was for an "extra" for painting a fence around other apartments of the contractor in the town of Fairbanks proper, and for the extra work for plastering around metal door casings, etc. (defendants' exhibit K).

The plaintiff called an expert witness and offered numerous exhibits in support of his testimony concerning the moisture content of lumber used in the project. This witness had made a moisture content test in the buildings several months after they had been completed and most of them occupied, indicating excess moisture. The evidence contains numerous government inspection reports. Few no-

tations in these reports exist as to the results of purported moisture tests, but this was explained by the government inspectors' testimony that actually the only time a moisture content test was recorded was when it was in excess of that amount allowable under the specifications (plaintiff's exhibits 35 and 36).

The plaintiff also introduced, over defendants' objection, exhibit 14 which was a collection of some 138 photographs taken by the expert in June 1954, from numerous sections and positions in the buildings, purportedly to illustrate the shrinkage and alleged imperfect materials used and the poor workmanship. There is no doubt that there was some shrinkage of lumber and popping of nails, but several of the government inspectors on the job at the time of the installation, testified that the work of the defendant was an average job and the defects alleged by the plaintiff were no more than those normally encountered in the average job.

Numerous conferences were had between the contractor, subcontractor and inspectors for the government in an effort to overcome the defects constantly appearing and reappearing in the painting and taping. It is interesting to note that on one punch list there were over 100 items that had to be corrected, some 90% attributable to painting and taping. Little success was had, so on the 22nd day of October 1953, a final conference was held at which time it was agreed by Mr. Carlson, for and on behalf of Soby, that he would take one building at a time and stay with it until it was finally completed and accepted by the government.

On the 23rd day of October one of the representatives of the contractor was making his routine inspection and discovered that Carlson had men working in various places, contrary to the agreement, at which time he fired him. Mr. Garvik took over direction of the work supra, under the subcontractor, with Ballard Dean as foreman.

On October 23rd, N. N. Coggeshell, an inspector, made a report to one Major Conlin of the District Engineers, and

after setting forth an outline of the painting problems too numerous to detail, recommended to the project engineer as follows:

"1. A complete re-organization of painting personnel.

"2. A thorough and competent foreman to lay out and recheck work being done.

"3. A complete understanding of what the contract specifications imply and mean in the term 1st class work.

"4. A realization of the fact that a man with a brush in his hand is not necessarily a Painter."

This report was concurred in by Lowell M. Todd, Project Engineer, October 24, 1953 (defendants' exhibit W).

About this time most of the contract bid price of the subcontractor had been advanced to him and it was necessary for the prime contractor to make payroll advances in order to keep the men on the job, which was done after it had obtained the consent of the bonding company of the subcontractor.

When none of the buildings were completed satisfactorily enough to be sold to the government, the additional-defendant bondsman, by its representatives, A. W. Murray, now deceased, and one George F. Douglas, an engineer who had been doing special work for the bondsman since 1949, made a trip from Seattle to Fairbanks around the first part of December 1953 to look into the subcontractor's problems. These representatives, after inspecting the project, contacted other painters in Fairbanks in an effort to determine how near the painting contracts were completed and also to ascertain how much it would cost to finish the work.

A meeting was had at the Nordale Hotel on December 10 between the plaintiff, A. W. Murray of the bonding company, and Lloyd Johnson for the defendant, in an effort to work out the problems. The plaintiff assured Mr. Johnson that he could obtain competent painters from Anchorage to complete the work.

A few days later the plaintiff phoned Mr. Johnson at Bellevue, Washington, and told him that Mr. Murray instructed him not to complete the job but instead to "clean it up" and "get off" the job that weekend. Mr. Johnson then immediately phoned Mr. Murray at Fairbanks to inquire of the change. Mr. Murray advised that he had changed his mind and told Johnson that he could see no reason why Soby should be left on the job. Mr. Johnson thereupon informed Mr. Murray that if such was to be the case, his company would expect the bondsman to complete the job. Mr. Murray then informed Johnson that the bonding company was not in the painting business and asked the prime contractor to obtain a competent painting contractor and have him complete the work, but asked that he not start the paint work until after the first of the year because of the pending holidays.

For the reason that the representative of the bondsman died prior to trial supra, the inclusion of exchanged correspondence between the bondsman and the defendant is necessary to give a true picture of their negotiations at this particular time. The following letter was written December 23, 1953, by A. W. Murray, attorney for the United States Fidelity and Guaranty Company, to the Kuney Johnson Company in Seattle.

"The above contractor has two contracts with you for painting, etc., one at Eielson Field and the other contract at Ladd Field.

"The writer, accompanied by Mr. George Douglas, our consulting engineer, was in Fairbanks and went over the situation with Mr. Soby who advised us that he was broke and financially unable to proceed further, and furthermore advised us that although on Ladd Field much of the work there had been completed that the same had been rejected by the inspectors and that it had to be done over again. It was obvious that Mr. Soby would be unable to proceed and due to the fact that it

was impossible to ascertain at that time the reasons for the rejection of the work performed, and furthermore there being considerable doubt as to whether or not the inspectors would ultimately pass the work, the United States Fidelity and Guaranty Company could not undertake the completion of the work under both these contracts.

"Mr. Johnson in a telephone conversation with the writer at Fairbanks tendered the completion of these contracts to the United States Fidelity and Guaranty Company, and this letter is to confirm such tender and also our regretful inability to accept the tender. Therefore, this leaves you free and without prejudice to complete the contract and to tender to us the claim of the cost of the completion over and above the contract prices involved.

"At this time the writer is making full report to date to our Home Office at Baltimore and asking for instructions with regard to future negotiations." (Defendants' exhibit DD).

Nothing final was determined at that time and the bonding company representatives returned to the states.

In the meantime, the plaintiff abandoned both contracts on the 19th day of December 1953, without further notice or reasons given, and with the apparent consent of the bonding company, leaving his supplies, materials and equipment at their respective sites.

Other meetings followed between the contractor and the plaintiff's bonding company. Another letter, dated December 29, 1953, was written by Max J. Kuney of the Kuney Johnson Company to the United States Fidelity and Guaranty Company, for the attention of Mr. A. W. Murray:

"At the meeting in your office this morning attended by you, Mr. George Douglas and Mr. Albert Prince and by Mr. Lloyd W. Johnson and me it was decided:

"(1) That if Soby claims he has been required to do additional work because of any act of the Government Contracting Officer or the Government Inspectors, or because of faulty design, he should immediately state his claims to us in writing so that we can assert them to the Government and thus obtain whatever additional compensation for him that his claims merit.

"(2) That if Soby claims he suffered additional costs because of any act, omission, fault or failure of ours or any of our other subcontractors, he should immediately state this claim direct to us so that the facts can be determined before the work is further disturbed.

"(3) That we should employ Harold Larson to complete the Soby contract and pay him a fee of 10% of the cost of painting labor for his services.

"You stated that you estimated it would cost about $65,000 over Soby's contract price to complete the Soby contracts, exclusive of about $30,000 in unpaid withholding taxes which you did not propose to pay, and that you had set up a loss reserve of $70,000 to take care of the $65,000.

"You requested that we advance the money necessary to complete the Soby contracts and we agreed to do so with the understanding the purpose of the bond was to finally reimburse us for all our costs in excess of Soby's contract price.

"It was agreed that Soby's had no trouble producing satisfactory work on his Eielson contract, but that all his trouble was on the Ladd contract. On both jobs the material specified was identical, applied to identical surfaces and the specifications were identical in every respect except 3 coats were required at Eielson and 2 coats were required at Ladd.

"Mr. Johnson stated the difference in results were entirely because Soby gave better supervision and

workmanship to the Eielson job and Mr. Douglas commented that he had found that the painting work rejected in Building 12 at Ladd was because of poor workmanship and was properly rejected.

"You stated, however, that you believed that the poor results at Ladd could be attributed to faulty Government design for which we could hold the Government responsible. We expressed our doubts on this point.

"You then stated you would supply the necessary witnesses to prove your contention that faulty design had produced condensation and moisture on all painted surfaces at Ladd so as to make it impossible to produce the specified results without greatly increased costs.

"In my opinion condensation or moisture has occurred only on the ceiling of the second floor. It is only in that location that we might contend that a moisture condition contributed to the painting troubles. Against that contention the Government could rightfully contend that the painting was equally defective on the first floor ceiling; where there is no moisture condensation, and on all the walls and painted surfaces throughout all the buildings at Ladd.

"If we are to assert any claim against the Government for additional painting costs because of any faulty design, we should do so within the next ten days. Therefore, if you have any evidence to that effect, we request you furnish it to us within that time." (Defendants' exhibit J).

Another letter, written December 31, 1953, by A. W. Murray, attorney for the United States Fidelity and Guaranty Company, Seattle, to the Kuney Johnson Company, Seattle, Washington, is quoted:

"The writer acknowledges receipt of your letter of December 29 outlining your interpretation of the discussion that took place between the respective parties referred to therein.

"Now, we wish to point out that United States Fidelity and Guaranty Company cannot speak on behalf of Soby. He has retained a lawyer, Mr. Edward Arnell of Anchorage. We do not know at this time the extent of Mr. Soby's claims and we are only able to give to you, or refer to you, such allegations as he made to the writer and Mr. Douglas. We agree with you that Mr. Soby should present to you as soon as possible his claims and to that end we have advised him of the meeting, or conference had by us, and told him that he should get his claims in shape and get them in promptly. Our correspondence, of course, was directed to his attorney who had already written to us on Mr. Soby's behalf.

"We agree with you as to items (1) and (2). With regard to item (3) so far as United States Fidelity and Guaranty Company is concerned, we approve of your employment of Harold Larson on the basis of the conditions outlined.

"With regard to the statement that we requested the advance of the monies necessary to complete the Soby contracts, that is not quite correct. As just stated above we stated that it was necessary for you to complete the work and that so far as the cost was concerned we approved of the steps you had taken to complete same. We stated that the purpose of the bond was to reimburse you for the cost of completing the work in excess of Soby's contract price. We wish, however, not to be misunderstood in any respect and point out that such reimbursement is subject, of course, to any legitimate claims that Soby may have, or may prove. We cannot act independent of, or without taking into consideration, such claims as our principal may assert or take such action that may prejudice his

claims. To do so would, of course, lay the surety open to liability to Mr. Soby. We did assure you, however, that as far as United States Fidelity and Guaranty Company is concerned we will endeavor to do all that we can to bring about a just settlement.

"With regard to the first paragraph page 2 of the letter, Mr. Douglas stated that he found that some of the taping and spackling was not satisfactory because of the fact that certain rough edges had not been sanded off. Mr. Douglas did not state that this condition applied to all of the apartments in building 12. Neither Mr. Douglas or the writer can agree with Mr. Johnson that the difference in results between the Eielson job and the Ladd job are entirely due or are due to better supervision and workmanship on the Eielson job.

"You advised us that the government was in the process of issuing a change order to correct conditions due to lack of ventilation which was producing condensation and that in order to make this correction, the ceilings of the second floor would have to be removed. Mr. Lloyd Johnson expressed his opinion that these ceilings were damaged as a result of improper design permitting no ventilation.

"We also pointed out that the condition of the heating plant, in particular with regard to the unit used for changing steam to water, was such as to create a very high heat in the apartment directly above said unit and as a result of this condition condensation was accelerated causing damages to adjacent apartments.

"I wish to point out also, and we emphasize the fact that the material; namely, the plaster rock at Ladd is defective by reason of the presence of moisture causing slacking with the result that the residue powder-like substance left after slacking makes it impossible for the nails to hold up the material and the nails are pulling through. We call to your attention that the material at Eielson appeared to be adequate.

"We are not prepared at this time to state what are the exact causes for the presence of moisture in the plaster rock at Ladd. We did state that assuming that this material was the same material used at Eielson and in the same condition, then the moisture could only have come from condensation on the outside of the inner wall composed of plasterboard or sheetrock. Since the ceilings in the upper stories were damaged by condensation due from faulty design, it is reasonable to suppose that this condition did not stop at the edge of the ceiling but extended into the wall.

"If the material used at Ladd was the same material and in the same condition as the material used at Eielson then it is evident that this material has been damaged on the first floor as well as the second floor.

"You state that the claim should be asserted within the next ten days. In the opinion of the writer ten days might not give Mr. Soby's attorney sufficient time to prepare and present the claim, but certainly the writer will urge that he do so. Unquestionably there should be no unreasonable delay in getting this claim before the government.

"In conclusion the writer would like personally to thank both Mr. Kuney and Mr. Johnson for the cooperation extended to the writer. Again let us assure you we will do everything that we can to bring about a fair settlement of the problems before us." (Defendants' exhibit J(a)).

In conformance with authority of plaintiff's bondsman in a letter dated December 31, 1953 supra, the prime contractor employed Larsen Brothers Painting Company of Tacoma, Washington, who had been painting in Alaska for a

number of years, to complete both contracts at cost of labor and materials plus 10% of the total painting payrolls *only* (defendants' exhibit C). Harold Larsen of the Larsen Brothers Painting Company testified that there is no profit in a job of this nature and, further, that he could expect nothing but headaches and that he only accepted the job as a favor to the defendants in hopes possibly of receiving other contracts some time in the future. Most of the same men formerly employed by Soby were used by Larsen. One Tom Corbett was placed in charge of the work, a man who had worked for the Larsen Brothers Painting Company for a number of years. He arrived on the job December 30, 1953, where he remained until both contracts were completed, which was some time in March 1954. All payrolls and other expenses of the Larsen Brothers Painting Company are supported by cancelled checks, invoices and correspondence (defendants' exhibits I, BB, etc.).

The percentage of plaintiff's completion when the plaintiff abandoned the contracts, under each contract and in each building, within the contracts, posed a problem of mean concern throughout the trial. The vexation to this question was multiplied by the percentages of completion reflected in the government required reports (plaintiff's exhibits 35 and 36, etc.).

While the government reports are informative, I am of the opinion that they are of little aid to the court in the determination of this problem, since the weight of evidence I find to be that such reports are only relative, and, generally speaking, little weight is attached to them by the contractor.

In support of plaintiff's claim for damages on the first cause of action, the plaintiff introduced exhibit 38, and the defendant introduced the worksheets used in compiling this exhibit (exhibit O) which is a computation purporting to reflect the extent of plaintiff's damages. While interesting, I find that this exhibit is based upon too many suppositions and assumptions to be of material aid in deciding this case and, further, if the court were to adopt the plaintiff's theory of damages reflected therein, it, of necessity, would have to completely abandon the long-established principles of contract law.

I find that the plaintiff did not have a contract with the prime contractor, either in law or in fact, for the extra work he was required to do in the form of taping, spackling and painting. Assuming, however, that the factual situation should be interpreted to give rise to contract, either implied in fact or implied in law, it is my opinion that the plaintiff would be precluded from recovery by his December abandonment of the project. McNeal-Edwards v. Frank L. Young Co., 1 Cir., 1931, 51 F.2d 699; Gillis v. Gillette, 9 Cir., 1950, 184 F.2d 872, 876. In the latter case the plaintiff contractor brought action to enforce a mechanic's lien upon the real property of the defendant for certain improvements which he had contracted to perform upon the land. He had, however, without justification from the defendant, abandoned the contract before it was fully performed. The Court of Appeals ruled:

"On the basis of the authority cited to us and as a result of our own research we are persuaded that the willful abandonment of the contract by the plaintiff, without cause, is a bar to any recovery of any further amount for the value of his services [citations]. The rule established * * * is to the effect that where one performs service for another which is of value to the latter, recovery may be had for the same on quantum meruit, unless there has been a willful abandonment of the undertaking by the party doing the work. * * *"

Ruling on this Alaska case, the Court of Appeals established the rule that willful abandonment is a bar to recovery in contract.

I am of the opinion that the costs of completion were unusually high due to many factors over which the prime con-

tractor had little or no control. This is unfortunate but they were brought about by the original poor workmanship of the plaintiff which necessitated the Larsen Brothers Painting Company having to duplicate much of the original painting work to make it acceptable to the government.

Numerous objections were made by the plaintiff as to the allocations of costs and expenses and to the segregation of the costs between the two contracts at Ladd and Eielson for the work done by Larson Brothers Painting Company. Suffice it to say that such objections were not well founded.

I find that the Larsen Brothers Painting Company had to do the work reflected by their accounting in order to have the buildings accepted by the government (defendants' exhibits C, E and I).

I find that the materials used by the defendants in the construction of the buildings as a whole fell well within the established limits of the contract specifications and that there was nothing about the defendants' conduct that would justify the plaintiff in abandoning his contract.

I am of the opinion and so find that the defendant prime contractor is entitled to judgment against the plaintiff and his bondsman on the first and second counterclaims. While the evidence is somewhat in conflict concerning the additional work which the plaintiff had to perform because he was so requested by government inspectors and because of faulty design, I find that the plaintiff never submitted a statement to the defendants or to the government for such additional costs and extra work, if any, even though it was agreed that he would do so, as disclosed by the letter of December 29, 1953, from the prime contractor to the bondsman supra, but instead, he waited until after the painting contract had been completed by the Larsen Brothers and the buildings accepted, and then filed his suit, which persuades me that no such contract or agreement to pay additional costs ever existed either in fact or in law.

I find the plaintiff is entitled to an offset in the total sum of $3,000 instead of the sum of $616 he is credited with by the defendants, for supplies and materials which the defendant found upon the jobs at the time it took over the work.

It is indeed very regrettable, since I am of the opinion the plaintiff is a very honest and forthright individual, but this is a classic example of a small contractor being presented with two large contracts and his business acumen not being sufficient to cope with the difficulties unfortunately normally encountered with labor, extreme climatic conditions, and other problems too numerous to mention, normally connected with the contracting business here in the Territory of Alaska.

I find that the lack of business acumen is not sufficient justification for defaulting on one's contract obligations, providing that there was no misrepresentation or fraud on the part of the other party. In this case, I find no such fraud or misrepresentation on the part of the prime contractor.

The prevailing party is hereby directed to prepare findings of fact and conclusions of law in accordance herewith.